FRANK TAMBURRINO, an Infant, by FRANCESCO TAMBURRINO, His Guardian ad Litem, and Another, Appellants, v. STERRICK DELIVERY CORPORATION and Another, Respondents.

First Department, May 18, 1934.

*Jules Chopak* of counsel [*Samuel Mazzola*, attorney], for the appellants.

*Robert H. Charlton*, for the respondents.

MERRELL, J. We think, upon the evidence, the infant plaintiff, a boy six years of age at the time of the accident, was entitled to recover a judgment for damages against the defendants, and that the verdict directed in favor of the defendants was erroneous, contrary to the evidence, and against the clear weight of the evidence.

The infant plaintiff, a boy six years of age, on June 5, 1931, was riding upon a contrivance known as a "scooter," on One Hundred and Fifteenth street between Third and Lexington avenues in the borough of Manhattan. There was located on the street, within a few feet westerly of the point where the infant plaintiff received his injuries, a public school. The accident occurred on a Friday at about eleven o'clock in the forenoon, when the school was in session. The weather was clear and the pavement dry.

East One Hundred and Fifteenth street, between Third avenue and Lexington avenue, had been duly and legally established as a "play street" by designation of the police commissioner of the city of New York theretofore made, pursuant to section 315 of the Greater New York Charter. The "scooter" upon which the infant plaintiff was riding was a home-made affair, consisting of a soapbox placed upon a board beneath which were the wheels of roller skates. At the time of the accident the infant plaintiff was being pushed in this "scooter," or "pushmobile" as it is sometimes called, on the northerly side of One Hundred and Fifteenth street by a cousin of the infant plaintiff, who was pushing the scooter from behind with one foot upon the board and the other upon the street. The evidence shows that the boys had come down to Third avenue on their "scooter" and went around the "play street" detour sign placed by the police department at the entrance of One Hundred and Fifteenth street from Third avenue. The plaintiff's cousin testified that he looked once or twice for traffic when he made the turn back into One Hundred and Fifteenth street.

Two disinterested eyewitnesses of the accident testified for the plaintiffs. They were Salvatore Piazza and Milton LaGattuta. Both of these eyewitnesses testified at the trial to the effect that as the infant plaintiff and his cousin were upon the pushmobile and were traveling in a westerly direction, the defendants' truck approached from the rear and continued up One Hundred and Fifteenth street behind the two boys on their scooter. Piazza testified that he was seated on a railing at the corner of One Hundred and Fifteenth street and Lexington avenue and saw the defendants' truck "coming down about thirty miles an hour;" that he heard no horn blown upon the truck, and that his hearing was good. Milton LaGattuta, the other disinterested eyewitness, testified that he saw the truck coming down the street "at a fast rate of speed * * * about thirty miles an hour," and that the defendants' truck swerved and skidded a distance of about thirty feet, the front part of the truck colliding with the scooter. LaGattuta also testified that at the time of the accident, and as long as he could remember, the street where the accident occurred had been a school street. LaGattuta identified plaintiffs' Exhibit 3, which is an enlarged photograph of a police stanchion placed at the head of the street, containing the warning: "Play Street — Detour [with arrow pointing both to the left and to the right] Police Dept." Other exhibits were offered and received in evidence showing the stanchion which had been placed, and also the public school on the southerly side of the street. LaGattuta also identified

a corner lamp post at Third avenue and One Hundred and Fifteenth street with a sign thereon reading as follows: " Notice. School Street (By ordinance Board of Aldermen). Drive slowly. Make no unnecessary noise under Penalty of the Law. President Board [*sic*] of Manhattan." LaGattuta testified that he heard no horn blown on the truck and that his hearing was very good.

Joseph Paul Vezaro, the chauffeur, who was driving the defendants' truck which collided with the pushmobile, testified that he was driving a truck belonging to the defendant Sterrick Delivery Corporation, upon behalf of the defendant New York World-Telegram Corporation, on One Hundred and Fifteenth street between Third and Lexington avenues, having entered One Hundred and Fifteenth street at Third avenue. The chauffeur was asked: " Q. And at what rate of speed were you going, in miles per hour, about?" To this inquiry his answer was as follows: " A. About twelve or fifteen miles per hour." Vezaro testified that he saw the boys on the " scooter," and described its construction, and testified that the children were thirty-five or forty feet away when he first saw them, and that he could stop his car at the rate of speed at which he was traveling within three feet. Vezaro recognized the photograph, plaintiffs' Exhibit 8, stating: " This one looks like the street here." Exhibit 8 was a photograph taken at the intersection of One Hundred and Fifteenth street and Third avenue, and showed a police stanchion in the middle front of the street with three boys standing by it and a public school to the middle left side. Vezaro admitted that there was a school on the street. Shown a photograph of the school, he recognized it. He testified that he had no customer to serve or business upon One Hundred and Fifteenth street, and that he was passing through it for the purpose of reaching One Hundred and Twenty-fifth street and Lexington avenue, where he was to deliver a bundle of newspapers. There is no dispute that the infant plaintiff sustained serious injuries, consisting of a fractured femur with a consequent shortening of his leg one and one-eighth inches. His injuries were permanent and he " wobbled " in walking. There was a slight tilt downward of the pelvis, and a permanent curvature of the spine.

There is an abundance of evidence in the case showing that East One Hundred and Fifteenth street, between Third avenue and Lexington avenue, was a school street. Not only was there upon the southerly side of the street a public school housing daily 4,000 pupils, but the street had been designated by the authorities as a school street, and at either end there had been erected signs giving information to that effect. Under the Police Traffic Regulations

(Art. II, § 5-a) an automobile driven upon such street was prohibited from exceeding a speed of ten miles per hour. The street, at the time of the accident and for a long period prior thereto, had been declared by the police commissioner, by virtue of section 315 of the Greater New York Charter, to be a "play street." Under the ordinances of the city (Police Traffic Regulations, art. II, § 16-c) automobiles were prohibited from going upon the street, *except for necessary business purposes on the street*. The testimony of the defendants' chauffeur was to the effect that he had no deliveries of newspapers to be made on that street, and was using the street solely for the purpose of reaching a customer at One Hundred and Twenty-fifth street and Lexington avenue. It, therefore, clearly appears that the driver of the defendants' truck violated the traffic regulations by going upon this school street. There was no dispute at the trial that the street in question was a school street, and that, at the time of the accident, eleven o'clock in the forenoon of a Friday, the school was in session. As to the speed of the car, the evidence of the two eyewitnesses was that it was traveling at least thirty miles an hour, whereas the chauffeur of the truck testified that he was driving the car from twelve to fifteen miles an hour when it struck the pushmobile. Article II of the traffic regulations then in force in the city of New York provided as follows:

"Operation of Vehicles.

" Sec. 5 (Speed) (a) Subject to the provisions of Sections 3 and 4, a rate of speed exceeding the following constitutes, by Ordinance, a prohibited rate of speed:  *  *  *  Ten miles an hour passing a school on school days between 8 A. M. and 4 P. M."

Section 3 provides that no person shall operate a vehicle at a speed as to likely endanger the life and limb of persons.

Section 4 provides that nothing shall be held to relieve any persons traveling on a street from exercising all reasonable care to avoid or prevent injury through collision with all other persons.

Article IV, with relation to "Traffic Signs and Signals," provided as follows: " Sec. 1. Drivers must at all times comply with directions on signs or street markings for the regulation of traffic, placed by the Police Department or  *  *  *  other municipal departments."

The chauffeur recognized the lamp post at the entrance of the street, where he saw the wording: " Notice. . School Street. Drive Slowly." The evidence shows that the defendants' chauffeur was not driving " slowly " when going at fifteen miles per hour. If he was going at the rate of speed at which the two disinterested eyewitnesses testified, then, surely, he was not driving slowly, but

recklessly. We are of the opinion that the defendants' chauffeur violated the police regulation making East One Hundred and Fifteenth street a "play street." The evidence very clearly shows that said street had, long prior to that time, been designated, and was at the time, a "play street." Children were allowed to be upon it, and were only expected to exercise slight care while there. Under the traffic regulations, the defendants' truck had no right to be there, unless it had special business on the street. The chauffeur's testimony is to the effect that it had no special or other business on that street at the time. We think the defendants' chauffeur should have anticipated that children would be playing upon the street, and should have exercised such a degree of control as would have avoided striking children playing upon the street. The official act of the police commissioner making it a play street was proven in evidence. The police commissioner's regulation was under direct statutory authority. Section 315 of the Greater New York Charter (as amd. by Laws of 1932, chap. 562) provides as follows: "It is hereby made the duty of the police department and force, * * * to * * * regulate, direct, control, restrict and direct the movement of all * * * automobiles and all other vehicles in the streets * * * for * * * the proper protection of human life and health, and to that end the police commissioner shall make such rules and regulations for the conduct of vehicular traffic in the use of the public streets, squares and avenues as he may deem necessary, the violation of which rules and regulations shall be triable by a city magistrate and punishable * * *."

In accordance with section 315, between December 9, 1920, and December 21, 1920, a request was made by a police captain that the street be made a "play street" during school hours on school days, by reason of the fact that a request had been made by the principal of the public school upon the street attended daily by 4,000 pupils. The request was indorsed and recommended by the captain in command, by the inspector and chief inspector, and was finally approved by the police commissioner. Thereupon the chief inspector directed that the commanding officer of the precinct where the street was located requisition two play ground street stands " and see that they are placed at this location during time specified." At the trial the court properly took judicial notice of the traffic regulations provided by article II, section 16-c, with relation to the operation of vehicles in restricted areas. Section 16-c provided as follows: " Play Streets. All Vehicles are prohibited from using any street designated as a play street, except as the requirements of the property abutting such play street may call for."

At the trial, trial counsel for the defendants contended that in order to establish a play street, the board of aldermen must adopt an ordinance for that purpose. Unquestionably, the board of aldermen had the *power* to establish play streets, but the provisions of the Greater New York Charter clearly show that, under section 315, it was made the " *duty* " of the police commissioner to regulate traffic to protect human life. Sections 43 and 50 of the same act gave the aldermen the " power " to act with respect to the rulings of the police commissioner. Those rulings were not invalid, and, unless revoked by the aldermen, had full force and effect. No affirmative legislation on the part of the board of aldermen was required to make them binding. The aldermen might reverse the action of the police commissioner, but in this case the proof showed that they never did. On May 5, 1925, the board of aldermen adopted an ordinance to amend article 3 of chapter 24 of the Code of Ordinances by the insertion therein of a new section in relation to " Streets designated as Play Streets." In that connection the committee of the board of aldermen on traffic reported as follows: " That this ordinance is to remove any doubt as to the jurisdiction of the Police Department over streets designated as play streets, so that the Police Department will be upheld in its regulation of traffic on such streets," and recommended the adoption of the ordinance. On April 13, 1925, the board of aldermen adopted " An ordinance to amend Article 3 of Chapter 24 of the Code of Ordinances, by the insertion therein of a new section in relation to ' Streets designated as play streets,' " and by section 37-b, with reference to streets designated as play streets, the following ordinance was adopted:

" 1. Play streets, designated as such by constituted legal authority, are to be used, primarily, for children to play in.

" 2. All vehicles, such as motorcycles, passenger automobiles, automobile trucks, horsedriven wagons, or any other type of conveyance, are prohibited from using any street, designated as a play street, except as the requirements of the residents of the property abutting such play street may call for."

Said ordinance was to take effect immediately upon its enactment, and was approved by the mayor on June 23, 1925.

The courts of this State have consistently upheld the power of the police commissioner to regulate street traffic. The leading case in the Court of Appeals was that of *Cherubino* v. *Meenan* (253 N.Y. 462), and clearly holds that the street upon which the infant plaintiff received his injuries was, at the time, a " play street " and

" primarily for children to play in." In the *Cherubino* case, Judge CRANE, of the Court of Appeals, wrote an opinion, for a unanimous court, containing the following: " The ruling made on the trial of this case brings up for review the extent of the power of the police commissioner of the city of New York to make traffic rules and regulations. That the Legislature may confer such power upon municipal authorities is well established (Dillon, Municipal Corporations [5th ed.], vol. 2, § 574, p. 903); *and that this power may be conferred upon a department of a city government,* as well as given to its legislative assembly, is also recognized. (*People ex rel. Lieberman* v. *Vandecarr,* 175 N. Y. 440 [and citing other cases].) * * *

" Assuming, therefore, that this rule has relaxed the care which the pedestrian must take, and increases the responsibility of the motorist, we come to the question whether the commissioner had the power under section 315 of the charter to make any such rule. The control of traffic by policemen, signal lights, signs, direction posts and safety zones are familiar to us all, and have as a rule been wisely and efficiently enforced throughout the cities of this State. Necessity has called for such action upon the part of the police authorities, and such power is to be found in most of the city charters. Highway commissioners have similar control outside of the municipalities. Most of these devices notify the driver and the pedestrian on the spot what to do and where to go. In one instance the policeman raises his hand — physical evidence of the power of the law. Where the policeman is not stationed, there is the red and green light, or the sign post, or disk, indicating one-way traffic, or the direction to be taken. *In the absence of any of these instrumentalities to show the public what the law requires, can the police commissioner adopt a rule having the force of an ordinance? The Legislature may confer such power upon the police commissioner, provided the rule is reasonable, the same as it has done in conferring like power upon the health department, building department or the board of aldermen.* * * * It may delegate its inherent power over these local matters to that instrumentality in the city government which it considers to be the most efficient and appropriate." (Italics are the writer's.)

To the same effect are other decisions of the Court of Appeals, notably, *Callahan* v. *Terminal Cab Corp.* (259 N. Y. 112); *Ganly* v. *Steel Storage & Trucking Corp.* (Id. 396); *Matter of Agoglia* v. *Mulrooney* (Id. 462); *People ex rel. Knoblauch* v. *Warden, etc.* (216 id. 154, 162), and *Matter of Stubbe* v. *Adamson* (220 id. 459). The Appellate Division, Second Department, has frequently passed upon the same question, upholding the police department in

making traffic regulations and giving such regulations the same force and effect as if made by the board of aldermen (*Castro* v. *N. Y. Railways Corp.*, 224 App. Div. 626; *Carolan* v. *Venechanos*, 236 id. 812, 813; *Ostrem* v. *Radish*, 240 id. 837). In the *Castro Case* (*supra*) the court said (at p. 626): " It appears that the police commissioner promulgated this regulation pursuant to the provisions of section 315 of the Greater New York Charter. The provision is to be found in said section, as amended by chapter 455 of the Laws of 1914. It is substantially recited in the judge's charge. *It will be noticed that the Legislature has given this power of regulation in the Greater New York Charter directly to the police commissioner. By the terms of the act, the police commissioner is authorized to make rules regulating traffic.*" (Italics are the writer's.)

It also appears from the evidence that the street where the plaintiff received his injury was, for many years, commonly recognized as a play street. This is evidenced by a police stanchion which had been erected at each end of the street. These stanchions were in place, according to the testimony of plaintiff's cousin, Vincent Tamburrino, and plaintiff's witness LaGattuta. Manifestly it was necessary, with a school upon the street housing daily 4,000 pupils, to make the street a play street for the protection of the children thereon.

The infant plaintiff was a boy of but six years of age, and was clearly *non sui juris*, and was called upon to exercise only that care which a person of his age would be expected to use. The record does not disclose the age of his cousin, who was pushing the scooter. The boys passed around the police stanchion warning vehicles that it was a play street, as they came down Third avenue and passed up One Hundred and Fifteenth street. The infant plaintiff's home was on the southerly side of One Hundred and Fifteenth street and the evidence shows that, prior to his scooter being struck, he was turning to the left to reach his home. The driver of the defendants' truck saw the boys thirty-five or forty feet ahead of him, and should have used due care to drive his truck slowly and avoid striking the children. The driver of the defendants' truck had no business upon the street, and, even though he had business there, violated the traffic regulations by exceeding ten miles an hour. He admitted at the trial that he was traveling from twelve to fifteen miles an hour. With the boys thirty-five or forty feet ahead of him, on a clear day, without anything to obstruct his vision, on a dry pavement, common prudence should have warned the driver of the defendants' truck to avoid hitting the children on the pushmobile. The defendants' truck had four-wheel brakes. The chauffeur testified that he could stop the same

within three feet, if necessary, at the rate of speed at which he was driving the truck. The chauffeur testified that he blew his horn to warn the boys, but the two eyewitnesses and the plaintiff's cousin all testified that they heard no horn blown. The two eyewitnesses both testified that they accompanied to the hospital the defendants' truck, in which the infant plaintiff was placed after being struck. The chauffeur denied that either of the eyewitnesses accompanied him on his truck to the hospital, although he admitted that he saw the witness LaGattuta at the hospital after taking the infant plaintiff there.

The evidence shows that the trial in the court below was rushed through without any adequate opportunity on the part of the plaintiff to introduce other and corroborative evidence of his contention that the street upon which he was injured was a play street.

Finally, we think the verdict directed by the court was contrary to the overwhelming weight of the evidence. There is no question but that the infant plaintiff sustained serious injuries, consisting of a fracture of his leg with resulting shortening and other permanent injuries. The accident happened upon a street upon which a public school was in session. The police regulations forbade the driving of the defendants' truck at a speed exceeding ten miles an hour under any circumstances. The chauffeur testified that he was driving from twelve to fifteen miles an hour. The great preponderance of the evidence supports the contention of the infant plaintiff, and clearly established negligence on the part of the defendants' chauffeur. The sole witness for the defendants was the chauffeur himself, at the time of the trial and for eight years prior thereto in the employ of the defendant. He was clearly an interested witness. His testimony was at times contradictory and was clearly overborne by the testimony of the infant plaintiff's cousin and of two wholly disinterested eyewitnesses. The testimony of these disinterested witnesses was not impeached in the slightest degree. Under the circumstances, the street being a play street, where the infant plaintiff and his companion were not called upon to exercise active vigilance for their safety, they could not properly have been held for contributory negligence. We think, therefore, that upon the evidence the court improperly directed a verdict for the defendants, and that the judgment should be reversed and a new trial granted, with costs to the plaintiffs, appellants, against the defendants, respondents, to abide the event.

FINCH, P. J., MARTIN, O'MALLEY and UNTERMYER, JJ., concur.

Judgment reversed and a new trial ordered, with costs to the appellants to abide the event.